**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  ltfisher@bursor.com
        slitteral@bursor.com
        jvenditti@bursor.com

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ROCIO LOPEZ, individually and on behalf of all others similarly situated, | Case No. **'22 CV 0421 L     RBB** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| ABBOTT LABORATORIES, | |
| Defendant. | |

Plaintiff Rocio Lopez ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Abbott Laboratories ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which is based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a putative class action lawsuit against Defendant for cheating consumers by uniformly advertising, marketing, and selling nutritional food products under the brand name "Similac" (collectively, the "Products," enumerated below), each of which prominently features the representations "Non-GMO," or similar claims related to the absence of ingredients derived from genetically modified organisms ("GMO") (collectively, the "Non-GMO Claims").  However, contrary to Defendant's claims, each of the purportedly "Non-GMO" Products do, in fact, contain ingredients that are derived from genetically modified food sources and therefore constitute GMOs.

2.     Defendant prominently labels every Product sold in the United States as "Non-GMO."  Defendant does this because consumers perceive all-natural foods as better, healthier, and more wholesome.  Indeed, in recent years, consumers have become significantly more aware and sensitive to genetically modified organisms ("GMOs") in their food.  Many consumers want to avoid GMOs for a variety of reasons, including, but not limited to, the following: (1) health risks associated with ingesting foods derived from genetically modified ("GM") crops;[1] (2) concerns of the ingestion of pesticides and other toxins; (3) interest in promoting sustainable living and local farming; and (4) negative environmental effects associated with growing GM crops.  As a result, many consumers, including Plaintiff, try to buy

---

[1] GM crops such as canola, corn, and soy, are crops whose genetic material has been altered by humans using genetic engineering techniques.  The World Health Organization defines GMOs, which include GM crops, as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally."  Accordingly, GM crops are not natural, but man-made.

products that are not derived from GMOs, and a movement has developed demanding consumer products that are non-GMO products.  Thus, the market for all natural foods has grown rapidly in recent years, and Defendant seeks to take advantage of this trend through false advertising.

3.     But Defendant's Non-GMO Claims concerning the Products are false, misleading, and deceptive to consumers, who reasonably understand such claims to mean that a product was produced without genetic engineering and its ingredients are not derived from GMOs.  Specifically, Plaintiff and consumers reasonably understand Defendant's Non-GMO Claims to mean that Defendant's Products are 100% free of ingredients derived from GM crops or food sources sourced from animals that have been raised on GMO feed.  Yet, contrary to Defendant's claims, Defendant's Products are in fact loaded with ingredients derived from GM-crops such as corn and soy, and many of Defendant's Products also contain protein and/or dairy sources derived from cows raised on GMO feed.  Defendant's Products also contain numerous artificial ingredients that were genetically engineered in a laboratory setting using biotechnologies.  Accordingly, Defendant's Non-GMO Claims are misleading and highly deceptive to reasonable consumers.

4.     At issue are the following products, which all contain the representation "Non-GMO" on the labeling and/or packaging: Similac Pro-Advance Ready-to-Feed Infant Formula, Similac Pro-Advance Powder Infant Formula, Similac Pro-Advance Powder Infant Formula with Iron, Similac Pro-Sensitive Ready-to-Feed Infant Formula, Similac Pro-Total Comfort Ready-to-Feed Infant Formula, Similac Pro-Total Comfort Baby Formula, Go & Grow by Similac Toddler Drink Powder, Go & Grow by Similac Sensitive Toddler Drink for Lactose Sensitivity Powder, Pure Bliss by Similac Toddler Drink Powder, Similac For Supplementation Gentle Infant Formula Powder, and Similac For Spit-Up Easy-to-Digest Powder (collectively, the "Products").  As noted above, each of these purportedly "Non-GMO" Products

contain GMOs. Plaintiff reserves the right to expand this Product list as more information becomes available during discovery.

5. By prominently featuring the Non-GMO Claims on the labeling and/or packaging of its Products, Defendant intends to induce consumers to pay more than they would pay for other comparable products that are not falsely labeled with Non-GMO Claims, and consumers are so induced as a result of these claims. Thus, although (as discussed below) the Products have been a marketing sensation and an unmitigated financial success, Defendant's success has been the result of fraudulent, unlawful, and unfair business practices in the marketing and sale of the Products. Defendant's misleading representations and unfair business practices described herein are plainly improper and unacceptable—particularly for a company that touts that "We listen to moms and dads, and they've told us they want a non-G.M.O. option;" that "We want to make sure we meet the desires of parents;" that "Over one-third of [Similac] consumers say [non-GMO infant formula] would appeal to them and given them peace of mind;"[2] that "when parents told us they wanted a Non-GMO option for their infant formula, we answered the call"; and that "We're expanding our product line with Similac Advance Non-GMO, which is the first and only leading formula brand labeled Non-GMO in the U.S."[3]

6. For the foregoing reasons, Plaintiff brings this action individually and on behalf of similarly situated individuals against Defendant for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (ii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; (iii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (iv) breach of express warranty; (v) breach of the implied warranty of merchantability; (vi) unjust enrichment /

---

[2] Stephanie Strom, "Similac Advance Infant Formula to Be Offered G.M.O.-Free," *The New York Times* (May 25, 2015), https://www.nytimes.com/2015/05/26/business/similac-advance-infant-formula-to-be-offered-gmo-free.html (last accessed Mar. 9, 2022).
[3] Similac, "Similac Advance Non-GMO – a Non-GMO option from the brand you trust," https://static.abbottnutrition.com/cms-prod/similac.com/img/SIM-PDF-NON-GMO-FAQ.pdf.

restitution; (vii) negligent misrepresentation; (viii) fraud; and (ix) fraudulent misrepresentation.

**PARTIES**

7.      Plaintiff Rocio Lopez is a natural person and a citizen of California who resides in Imperial, California.   In approximately October 2021, Ms. Lopez purchased Defendant's Similac Pro-Advance Infant Formula With Iron Milk-Based Powder from a Costco brick-and-mortar retail store located in Imperial.   Prior to her purchase, Ms. Lopez reviewed the labeling, packaging, and marketing materials of her Products and saw the false and misleading claims that, among other things, the Products are purportedly "Non-GMO" infant formulas.   Ms. Lopez understood these claims to be representations and warranties by Defendant that the Products are free of all traces of GMOs, do not contain ingredients derived from GM crops, and do not contain any other synthetic ingredients created in a laboratory through the use of biotechnologies.   Ms. Lopez reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that she would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known. As a direct result of Defendant's material misrepresentations and omissions, Ms. Lopez suffered, and continues to suffer, economic injuries.

8.      Plaintiff continues to desire to purchase infant formulas that are Non-GMO from Defendant.   However, Plaintiff is unable to determine if the Product is actually made from ingredients that are Non-GMO.   Plaintiff understands that the composition of the Product may change over time.   But as long as Defendant may use the phrase "Non-GMO" to describe the Product and it is not actually Non-GMO, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitor's Products.   Plaintiff is further likely to repeatedly be misled

by Defendant's conduct, unless and until Defendant is compelled to ensure that Products marketed, labeled, packaged, and advertised as Non-GMO, are in fact Non-GMO.

9.      Defendant Abbott Laboratories is an Illinois corporation with its principal place of business in Chicago, Illinois.  Defendant Abbott Laboratories sells its baby food and infant formulas under the "Similac" brand name.  Similac's baby food products and infant formulas are sold nationwide, including throughout the State of California.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

11.      This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself of this forum by conducting substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District, as Plaintiff purchased the Products in this District and is a citizen and resident of this District.

## FACTUAL ALLEGATIONS

### A.      Background on Genetically Modified Organisms ("GMOs")

13.      The World Health Organization defines genetically modified organisms ("GMOs") as "organisms in which the genetic material (DNA) has been altered in a

way that does not occur naturally."[4]

14.   Genetic modification ("GM"), also called genetic engineering, biotechnology, or bioengineering, is the process scientists use to make GMOs.  It is an artificial laboratory-based technique that is specifically designed to enable the transfer of genes between unrelated or distantly related organisms.  It includes any process in which genetic material is artificially manipulated in a laboratory, and may involve creating combinations of plant, animal, bacteria, and virus genes that do not occur in nature or through traditional crossbreeding methods.  Genetic engineering also includes newer forms of biotechnology such as CRISPR, TALEN, RNAi, ODM, and gene drives.  These techniques confer new properties or "traits" that are not naturally present in the organism.  When incorporated into the DNA of an organism, genetically modified genes modify the functional characteristics – the traits – of an organism.

15.   GM crops, such as canola, corn, and soy, are crops whose genetic material has been altered by humans using genetic engineering techniques.  GM crops are not natural, but man-made.  There are wide-ranging controversies related to GM crops, including health risks from ingesting GM foods and negative environmental effects associated with growing GM crops.

16.   As of 2021, approximately 94% of soybeans, 92% of corn, and 93% of canola grown in the United States are genetically modified, as are 95% of sugar beets.[5]

---

[4] World Health Organization (WHO), *20 questions on genetically modified foods* (2002), *available at* http://www.who.int/foodsafety/publications/biotech/20questions/en/index.html.

[5] *See* Center for Food Safety, "About Genetically Engineered Foods," https://www.centerforfoodsafety.org/issues/311/ge-foods/about-ge-foods#:~:text=Center%20for%20Food%20Safety%20seeks,human%20health%20and%20the%20environment (last visited March 9, 2022); *see also* https://www.nestleusa.com/gmos/about-genetically-modified-crops-in-the-us#:~:text=Approximately%2093%20percent%20of%20the,is%20from%20genetically%20modified%20seed.&text=Corn%20is%20the%20most%20widely,is%20from%20genetically%20modified%20seeds (last visited March 9, 2022).

(a)   **Corn** (Approx. 92% of U.S. crop is GMO) – Corn is genetically modified to be resistant to glyphosate or glufosinate herbicides.  Most GM-corn is used for human consumption.  In food products, GM-corn crop is used to produce corn flour, meal, oil, starch, modified food starch, corn gluten, corn syrup, and sweeteners such as fructose, dextrose, glucose and modified come from corn.  Genetically modified corn has been linked to health problems, including weight gain and organ disruption.

(b)   **Soybeans** (Approx. 94% of U.S. crop is GMO) – Soybeans are the most important crop worldwide for producing oil and protein.  Soybean and its processed derivatives are used in a multitude of food, groceries, supplements, and cosmetics.  Additionally, the remaining soy mass is used as protein-rich animal feed for fish, poultry, pigs, and beef.  Tolerance to herbicides is by far the most important commercial characteristic of GM-soybeans.  So, not only are soybeans a genetically engineered food crop, but farmers are also forced to use more and more pesticides to combat adaptive super bugs and super weeds, thereby creating additional health concerns for consumers.

(c)   **Canola or Rapeseed** (Approx. 93% of U.S. crop is GMO and 95% of Canada's crop is GMO) – Canola oil, which was originally bred from rapeseed in Canada, is now genetically engineered for resistance to herbicides (glyphosate or glufosinate), for high laurate canola and oleic acid canola.  It is considered one of the most chemically altered oils sold in the U.S. and Canada.[6]

(d)   **Sugar Beets** (Approx. 95% of U.S. crop is GMO) – Sugar beets are genetically engineered to be RoundUp ready, like corn.  GM-sugar beets are used

---

[6] *See GMO 101, A Practical Guide: Potential Sources of Genetically Engineered Ingredients in Food*, at 53, *available at*
https://play.google.com/books/reader?id=YeHXBQAAQBAJ&pg=GBS.PA2&hl=en.

in refined sugar production, and the leftover fiber is used to feed animals at Concentrated Animal Feeding Operations ("CAFO").[7]

17.    Thus, any of the ingredients derived from domestically produced canola, corn, peas, rice, or soybeans are highly likely to contain GMOs, notwithstanding Defendant's Non-GMO Claims or similar product label representations to the contrary.

**B.    "Non-GMO" Is A Highly Profitable Descriptor**

18.    Product packaging is a significant vehicle through which the purveyors of natural and organic food products communicate material that they believe, and reasonably expect, to be important to consumers in making purchasing decisions.

19.    The health food market is no longer a niche market. Consumers have been increasingly health conscious since the 1970s. They seek out and covet food products that are natural and healthy and look for labels that convey these qualities in the foods they choose to purchase. According to *Natural Foods Merchandiser*, a leading information provider for the natural, organic, and health food industry, the natural food industry enjoyed over $166 billion in revenue in 2019. This means that since 2010, the natural food industry has more than doubled in size since it hit $81 billion in 2010. Consumer demand for non-GMO foods is expected to rapidly increase into the next decade as well.

20.    The designation "non-GMO" appeals to consumers for its health attributes. This designation also appeals to reasonable consumers' interest in protecting the environment, promoting sustainable living and local farming, and minimizing people's and the Earth's exposure to pesticides and other toxins.

21.    Any doubt about the money generating power of natural and healthy foods is dispelled by the entry and success of large conglomerates in the health food market. For example, the well-known *Kashi* brand is owned by *Kellogg*, while

---

[7] *Id.* at 244 ("Anything not listed as 100% cane sugar is suspect. Look for organic and non-GMO sweeteners, candy and chocolate products made with 100% cane sugar, evaporated cane juice or organic sugar, to avoid GM beet sugar.").

*PepsiCo* has recently acquired the natural food company, *Be & Cheery*, for $705 million. Additionally, the *Odwalla* brand has flourished and expanded significantly since its purchase by the *Coca-Cola Company* in 2001 for $181 million.

22. Indeed, Defendant has acknowledged that, "We listen to moms and dads, and they've told us they want a non-G.M.O. option;" that "We want to make sure we meet the desires of parents;" and that "Over one-third of [Similac] consumers say [non-GMO infant formula] would appeal to them and given them peace of mind."[8]

### C.    Consumer's Understanding of GMOs and Non-GMO Claims

23. While the abbreviated term "GMO" may generally refer to genetically modified organisms, when used in food marketing and labeling, terms like "non-GMO" and "GMO free" (which are reasonably understood by consumers to be synonymous)[9] have a broader meaning to consumers in that they convey food products that do not contain and are not sourced or derived from genetically engineered foods and methods, such as genetically engineered corn that ends up in corn syrup and beef from a cow that was raised on a diet of genetically engineered or modified food. Consumers have this understanding because of educational efforts by

---

[8] Stephanie Strom, "Similac Advance Infant Formula to Be Offered G.M.O.-Free," *The New York Times* (May 25, 2015), https://www.nytimes.com/2015/05/26/business/similac-advance-infant-formula-to-be-offered-gmo-free.html (last accessed Mar. 9, 2022).

[9] In November 2015, the Food and Drug Administration ("FDA") issued guidelines on the labeling of foods derived from genetically engineered plants and grouped the terms "*GMO free*," *GE free*," "*does not contain GMOs*," "*non-GMO*" "*and similar claims*" together. U.S. Food and Drug Administration, *Guidance for Industry: Voluntary Labeling Indicating Whether Foods Have or Have Not Been Derived from Genetically Engineered Plants* (Mar. 2019), *available at* http://www.fda.gov/food/guidanceregulation/guidancedocumentsregulatoryinformation/ucm059098.htm#references (emphasis in original). The FDA also warned that the term "free" that is associated with these similar claims "conveys zero or total absence" of ingredients derived through biotechnology and that these types of claims are "problematic" due to the challenges of substantiating such claims. *Id.* Thus, the FDA took care to appropriately group these commonly used "non-GMO" related labeling terms in the same fashion consumers do, demonstrating that "non-GMO," "does not contain GMOs," and "GMO free" have an identical and synonymous meaning to consumers. The FDA also points out that the while the "O" in the acronym GMO generally refers to the word "organism" because an entire organism is generally not contained in a food (microorganisms in the dairy product yogurt being a cited exception), GMO is generally "read as meaning that the food was not *derived from* a genetically modified organism, such as a plant that has been genetically engineered." *Id.* (emphasis in original).

"non-GMO" consumer information sources and certification agencies as well as government authorities.  The successful results of their efforts to develop a consumer understanding of "non-GMO" and related terms in this manner are demonstrated by market research surveys as discussed below.

24.    The Non-GMO Project, for example, serves as one of the leading educational providers for consumers given its unique status as North America's "only third-party verification and labeling for non-GMO food and products."  In response to increased use of GMOs, the Non-GMO Project was formed in the early 2000s with the goal of "creating a standardized meaning of non-GMO for the North American food industry."  Because of the Non-GMO Project's work with companies and food producers, through its Independent Verification Program, its Non-GMO Project Verified seal is now found on over 50,000 food products and with 3,000 participating brands.[10]  Further, it makes significant educational outreach efforts through its Non-GMO Project and LivingNonGMO.org websites.  Combined, these websites are host to over 200 million visits a year.  Consumers thus readily and understandably associate the terms "GMO", "non-GMO," and similar marketing claims, consistently with definitions set by the Non-GMO Project.

25.    Accordingly, consumers understand that any product or ingredient that is contaminated by or with GMOs is not "non-GMO."  And, the Non-GMO Project specifically extends its definition of "Non-GMO or No-GM" to any "plant, animal, or other organism whose genetic structure has not been altered by gene splicing" *and* to "a process or product that does not employ GM processes or inputs."[11]  Per the consumers' leading industry source, the Non-GMO Project states that "animal feed commonly contains High-Risk Inputs" in the form of genetically modified or

---

[10] *See* The Non-GMO Project, *Verification FAQs*, https://www.nongmoproject.org/product-verification/verification-faqs/ (last accessed Mar. 9, 2022).

[11] The Non-GMO Project, *Non-GMO Project Standard* (Dec. 30, 2020), at 24, *available at* https://www.nongmoproject.org/wp-content/uploads/Non-GMO-Project-Standard-Version-16.pdf (last accessed Mar. 9, 2022).

engineered feed.  As a result, animal food products (such as meat, poultry, and dairy) are included on the Non-GMO Project's list of High-Risk ingredients.  For animal products to be properly labeled as "non-GMO," they must meet a number of stringent requirements, including that the animals and poultry be fed seed that is less than 5% GMO for various periods of the animal's life (including the entire life for meat animals other than poultry).  Other GMO awareness campaigns similarly advise consumers that to avoid GMOs they should avoid "meat, eggs, and dairy products that have eaten GMO feed" furthering the consumer understanding that "non-GMO" and related marketing, labeling[,] and advertising claims indicate to consumers that the animal products were not raised on genetically modified feed.[12]

26.   The federal government has also taken steps to adopt standards that assist companies and consumers with understanding that "non-GMO" labeling means that animal products are not raised on GMO derived feed.  For example, in mid-2013, the U.S. Department of Agricultures' Food Safety and Inspection Service, tasked with regulating the safety and proper labeling of meat, poultry, and egg products, approved the Non-GMO Project Verified label claim for meat and liquid egg products.[13]  These government efforts are intended to inform consumers that the animal was not raised on a diet that consists of genetically engineered ingredients, like corn, soy, and alfalfa.  Accordingly, consumers understandably associate advertising or labeling with the terms "non-GMO" or "GMO free" with products whose ingredients have not been tainted by GMOs or sourced from animals fed with GMOs.

27.   Market research also supports the fact that consumers understand and expect that advertisements and labeling of "non-GMO," "GMO free," or related

---

[12] GMO Awareness, *Overview*, https://gmo-awareness.com/avoid-list/overview/ (last accessed Mar. 11, 2022).

[13] *See* Food Liability Law, *USDA Approves Non-GMO Label Claim for Meat and Egg Products* (Jul. 11, 2013), http://www.foodliabilitylaw.com/2013/07/articles/legislation-and-regulation/food-labeling/usda-approves-non-gmo-label-claim-for-meat-and-egg-products/ (last accessed Mar. 9, 2022).

claims have similar meanings and would not apply to foods sourced from animals fed with a GMO or a genetically engineered diet.  For example, a poll of Ohio voters by Public Policy Polling in December 2015 indicated that 76% of consumers would "[e]xpect that a dairy product labeled as "non-GMO" was made using milk from cows that had not been fed any genetically modified feed."[14]   Only 11% of respondents would not expect such a product to come from cows fed only with non-GMO feed.[15]

28.    As these poll results indicate, "consumer awareness of GMOs is almost universal at 97%."[16]  Consumers reasonably understand food advertised or labeled as "non-GMO," "GMO free," "does not contain GMOs," or other similar claims only apply to food that (1) does not contain GMOs and is not sourced from, or derived from any GMOs; and (2) does not contain animal products such as meat, poultry, pork and dairy that have a diet of GMO feed, GMO contaminated feed and/or genetically modified or engineered feed.  Consumers also understand that the term "food" applies broadly to food *and* drink, which is also how the FDA defines it.  21 U.S.C. § 321(f)(1).

## D.    Consumers Perceive GMOs As Negative And Unhealthy

29.    Today, genetically modified crops are used in biological and medical research, production of pharmaceutical drugs, experimental medicine, and agriculture.  Such crops are engineered to, among other things, resist certain pests, diseases, or environmental conditions, reduce spoilage, increase size and yield, taste and look better, and resist chemical treatments.  In the United States, 94% of the

---

[14] *See* The Mellman Group, "Nearly All Voters Continue to Want GMO Foods Labeled," (Nov. 23, 2015) http://4bgr3aepis44c9bxt1ulxsyq.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/15memn20-JLI-d6.pdf (last accessed Mar. 9, 2022).

[15] *See also* Center for Food Safety, *U.S. Polls On GE Food Labeling* (listing other relevant surveys regard GMO food labeling and consumer preferences).

[16] "Consumer Awareness of GMOs Continues to Soar,"  Non-GMO Project (Aug. 7, 2018), https://www.nongmoproject.org/blog/consumer-awareness-of-gmos-continues-to-soar/ (last accessed Mar. 9, 2022).

planted area of soybeans, 95% of cotton, and 92% of corn are genetically modified varieties.[17]

30.    Since 1996, farmers in animal agriculture (including poultry) have optimized GMOs by feeding genetically modified grains (corn) and oilseeds (soybean) to their flocks and herds.[18]   Because more than 90% of the corn and soybeans in the United States are raised from genetically modified seeds, almost all corn and soybean used in conventional livestock and poultry feed is genetically modified.  In addition, other genetically modified crops such as cotton, canola, sugar beets, and alfalfa are commonly used in animal feed.[19]   Consequently, most meat and dairy products are contaminated with GMOs due to the feed consumed by livestock and poultry and cannot be labeled as "non-GMO" without deceiving consumers. Because the safety or health impact of food and other goods derived from genetically modified crops has been and continues to be hotly debated,[20] it is no surprise that according to a Pew Research Center survey, only 37% of the general public believes that "it is generally safe to eat genetically modified (GM) foods."[21]

---

[17] United States Department of Agriculture Economic Research Service, *Adoption of Genetically Engineered Crops in the U.S.*(July 9, 2015), http://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us.aspx (last accessed Mar. 9, 2022).

[18] *See* National Chicken Council, *Genetically Modified Organism (GMO) Use in the Chicken Industry* (July 5, 2013), http://www.nationalchickencouncil.org/genetically-modified-organism-gmo-use-in-the-chicken-industry/ (Mar. 9, 2022).

[19] *See* GMO Inside Blog, "How Pervasive are GMOs in Animal Feed?" *Green America* (July 16, 2013), http://gmoinside.org/gmos-in-animal-feed/ (Mar. 9, 2022).

[20] *Compare, e.g.*, European Commission, *A Decade of EU-funded GMO Research* (2001-2010), https://op.europa.eu/en/publication-detail/-/publication/d1be9ff9-f3fa-4f3c-86a5-beb0882e0e65 (last accessed Mar. 9, 2022), *with* Non GMO Project, *GMO Facts*, http://www.nongmoproject.org/learn-more/ (last accessed Mar. 9, 2022) ("Meanwhile, a growing body of evidence connects GMOs with health problems, environmental damage and violation of farmers' and consumers' rights.").

[21] Pew Research Center, *Public and Scientists' Views on Science and Society* (Jan. 29, 2015), https://www.pewresearch.org/science/2015/01/29/public-and-scientists-views-on-science-and-society/ (last visited Mar. 9, 2022).

31.    While the potential environmental and health impact of GMOs has been the subject of much scrutiny and debate within the food and science industries,[22] Defendant and other businesses know customers attach an unhealthy, negative perception towards them.[23]  Defendant's Non-GMO Claims are specifically intended to manipulate consumers into avoiding GMOs, including animal food products raised on GMO feed, because of health and environmental concerns.

32.    As a result of GMO controversy and consumer concerns, companies have created an $11 billion (and fast growing) market for non-GMO products and consumers are willing to pay the higher costs associated with non-GMO products due to the negative perception of genetically modified foods and because GMO-free ingredients are often more expensive.[24]  And, there is no dispute that GMO labeling is a material and important issue to consumers.  In a November 2015 poll, 89% of likely voters in 2016 would support labeling of GMO foods.  And, 77% percent of those "strongly favored" such a requirement.  These poll results clearly show that Americans want to know if the food they purchasing are non-GMO.  Thus, there is no dispute that GMO labeling is a material and important issue to consumers.[25]

---

[22] The Institute for Responsible Technology—"a world leader in educating the public and change-makers about the health risks and environmental dangers of GMOs and associated pesticides"—for example, outlines several health risks associated with the use of GMOs, including the growth of pre-cancerous cells, stomach lesions, change changes in blood cells, and livers and kidneys in the animals studied.  The Institute identified several other issues such as skin and intestinal reactions. *See* "65 Health Risks of GM Foods,"  https://www.responsibletechnology.org/gmo-dangers/65-health-risks-of-gm-foods/ (last accessed Mar. 28, 2022).

[23] *See, e.g.,* Stephanie Strom, "Similac Advance Infant Formula to Be Offered in G.M.O.-Free," The New York Times (May 25, 2015), https://www.nytimes.com/2015/05/26/business/similac-advance-infant-formula-to-be-offered-gmo-free.html (last accessed Mar. 11, 2022) ("Abbott will join a growing number of companies offering products without genetically modified organisms. Consumer demand for such products has been growing, despite a concerted and expensive effort by trade groups representing major food manufacturers and the biotech industry to convince them that genetically altered ingredients are not harmful to human health.").

[24] *See* Gluten Free Living, *GMO Free Comes at a Price, Gluten-Free Living* (Nov. 25, 2014), http://www.glutenfreeliving.com/gluten-free-lifestyle/non-gmo/gmo-free-comes-at-price/ (last accessed Mar. 9, 2022); The Mellman Group, Inc., *Voters Want GMO Food Labels Printed On Packaging*, http://4bgr3aepis44c9bxt1ulxsyq.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/15memn20-JLI-d6.pdf (last accessed Mar. 9, 2022).

[25] The Mellman Group, Inc., *Voters Want GMO Food Labels Printed On Packaging*, http://4bgr3aepis44c9bxt1ulxsyq.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/15memn20-JLI-d6.pdf (last accessed Mar. 9, 2022).

**E.    Defendant's False, Misleading, And Deceptive Non-GMO Claims**

33.    In 2018, sales of baby food and infant formula amounted to $6.9 billion, a level that has more or less remained unchanged over the past three years.[26] Defendant has been repeatedly identified as a "major player[]" in that market.[27]  In fact, Defendant reported to shareholders that "the nutritional business experienced above-market growth . . . driven by market leading brands Similac and Pedialyte."[28] Provided the significance of this segment to Defendant's portfolio, Defendant has an enormous incentive to increase its market share in this area.

34.    According to one study, behind the brand name, the presence of an "Organic / Non-GMO" label on infant formulas and toddler milk represent the second foremost factor that consumers consider when making their purchases.[29] Therefore, product offerings that include the Non-GMO label on baby foods and infant formulas provides a significant avenue for growth.

35.    Recognizing this reality, Defendant expanded its "Non-GMO" product lines in 2015, noting that "We listen to moms and dads, and they've told us they want a non-G.M.O. option;" that "We want to make sure we meet the desires of parents;" and that "Over one-third of [Similac] consumers say [non-GMO infant formula] would appeal to them and given them peace of mind."[30]  In line with this

[26] Business Wire, "Baby Food Market in the United States, 2019 Report," (May 21, 2019), https://www.businesswire.com/news/home/20190531005441/en/Baby-Food-Market-in-the-United-States-2019-Report---ResearchAndMarkets.com (last accessed Mar. 9, 2022).

[27] *See, e.g.*, PR Newswire, "Global $74.4 Bn Baby Food and Infant Formula Markets, 2011-2018 & 2019-2024 Featuring Abbott Nutrition, Nestle, Danone, Mead Johnson & Kraft Heinz," (Apr. 30, 2019) (https://www.prnewswire.com/news-releases/global-74-4-bn-baby-food-and-infant-formula-markets-2011-2018--2019-2024-featuring-abbott-nutrition-nestle-danone-mead-johnson--kraft-heinz-300840759.html) (last accessed Mar. 11, 2022).

[28] Abbott Laboratories, Form 10-K Annual Report (Feb. 22, 2019), https://sec.report/Document/0001047469-19-000624/ (last accessed Mar. 11, 2022).

[29] Tassneem Rajeh, "Provision of Added Value Infant Formula And Toddler Milk To Infants and Toddlers,"(2020), https://www.proquest.com/openview/4ca50d80afac71637c9c008cdd8daf3c/1?pq-origsite=gscholar&cbl=18750&diss=y (last accessed Mar. 9, 2022).

[30] Stephanie Strom, "Similac Advance Infant Formula to Be Offered G.M.O-Free," *The New York Times* (May 25, 2015), https://www.nytimes.com/2015/05/26/business/similac-advance-infant-formula-to-be-offered-gmo-free.html (last accessed Mar. 9, 2022).

sentiment, Defendant states directly on its website that "We know that now, more than ever, moms want a fresh approach to infant nutrition.  Whether you're looking for a formula that has organic ingredients, no artificial hormones, or no GMOs, Similac offers an option that's right for you and your little one."[31]

36.    And Defendant's statements extend to the Product packaging, where, instead of the Non-GMO Project's seal, Defendant prominently includes its own seal or logo, which is substantially identical to the image set out below:



37.    In addition, Defendant has engaged in a multi-media mass marketing and advertising campaign to inform consumers that it was going "non-GMO" since approximately March 2015, through various methods including claims on its website, social media, in-store signage at the brick-and-mortar retail locations where its Products are sold, and—most importantly—prominent Non-GMO claims affixed to the labeling and/or packaging of its Products.

38.    These efforts, including Defendant's prominent use of its own Non-GMO label affixed to Product packaging, are intended to further Defendant's desire to appear as supporting healthy food for infants and toddlers, thereby increasing its share of the booming baby foods and infant formulas market and, correspondingly, the revenues it derives from that market.

39.    However, rather than manufacture infant formulas that are "Non-GMO" as understood by reasonable consumers, Defendant has manufactured its own

---

[31] Similac, "Organic and Non-GMO Baby Formula," https://www.similac.com/baby-feeding/formula-guide/organic-non-gmo.html (last accessed Mar. 9, 2022).

1   approach, and has otherwise sought to deceive consumers by passing the buck to its

2   suppliers.[32]

3   **F.      Defendant's Products Contain Genetically Modified Ingredients**

4   **Despite Being Marketed As "Non-GMO"**

5       40.    All of the Similac Products at issue are substantially similar.   All

6   varieties contain Defendant's "Non-GMO" Claim featured prominently on the front

7   of the Product's labeling and/or packaging.   However, Defendant's Non-GMO

8   claims are deceptive and misleading to reasonable consumers because: (1)

9   Defendant's Products are in fact loaded with ingredients derived from GM-crops; (2)

10   Defendant's Products also contain protein and/or dairy sources derived from cows

11   raised on GMO feed; and (3) Defendant's Non-GMO seal may be easily confused

12   with a third-party Non-GMO verification.   Even worse, none of the Product labels

13   expressly state that the Products contain GMOs, and Defendant does not adequately

14   disclose any of this information to consumers on its Product labels or on its website.

15       (a)    Defendant's Products Contain Animal Byproducts That Are Not

16   Non-GMO:   As set forth above, consumers understand the terms "non-GMO,"

17   "GMO free," and similar representations, to apply only to ingredients that do not

18   come from animals fed with genetically engineered or GMO derived feed.

19   Defendant deceptively advertises, labels, and markets its Products as "Non-GMO" or

20   "GMO free" even though *each* of the Products at issue in this case contains whey-

21   based protein sources (among other dairy-based ingredients) – including whey

22   protein isolate, whey protein concentrate, cultured whey protein concentrate, etc. –

23   derived from animals (specifically, cows) that are fed with a genetically engineered

24   or GMO-derived feed.   Additionally, many Products also contain other dairy-based

25

26

27   ---
[32] Similac, "Organic and Non-GMO Baby Formula," https://www.similac.com/baby-feeding/formula-guide/organic-non-

28   gmo.html#:~:text=What%20is%20non%2DGMO%20formula,%C2%AE%20Organic%20with%20A2%20Milk (last accessed Mar. 11, 2022).

ingredients derived from cows raised on GMO feed, such as milk, nonfat milk, and lactose.

(b)    Defendant's Products Contain Ingredients Derived From GM-Crops And Therefore Are Not Non-GMO: As detailed below, Defendant's Products contain numerous ingredients derived from GM crops.   For instance, *each* of Defendant's Products contains soy protein isolate, an ingredient derived from GM soybean.   Most of Defendant's Products also contain ingredients derived from GM soybean and sugar beets.

41.    Defendant's Products contain, without limitation, one or more of the following ingredients:

- **Assorted Dairy Ingredients and Products** (including lactose, nonfat dry milk, cultured whey proteins, whole milk, etc.).   These ingredients are specifically identified as genetically modified ingredients by the Institute for Responsible Technology.[33]   The United States currently devotes nearly 75 million acres of land to the production of soybeans, most of which are fed to animals. Similarly, much of the nation's 80 to 90 million acres of corn is fed to livestock. Since 85 to 95% of these crops are GMO, it is safe to assume – unless provided proper certification – that "normal" dairy products contain GMO ingredients in one form or another.   Thus, unless a product is USDA Certified Organic or has a Project Non-GMO Verified seal, "ALL dairy products can be assumed to come from commercial/industrial dairy sources (CAFO - concentrated animal feeding operations) whose cows are typically fed GM-corn, cottonseed, alfalfa[,] or soybean feed."[34]

---

[33] The Institute for Responsible Technology, "Non-GMO Shopping Guide,"
https://www.pilgrimsmarket.com/pdf/Non-GMO-Shopping-Guide.pdf at 14 (last accessed Mar. 28, 2022).
[34] *See* Chef Alain Braux, *GMO 101, A Practical Guide: Potential Sources of Genetically Engineered Ingredients in Food*, at 184, *available at*
https://play.google.com/books/reader?id=YeHXBQAAQBAJ&pg=GBS.PA2&hl=en.   As Chef Alain Braux, award-winning executive chef and multiple award-winning food and health author, further explained:

- **Citric Acid**.  This ingredient is included on The Institute for Responsible Technology's list of GMO ingredients.[35]  Citric acid was the first additive that was produced on a large scale biotechnically.  Most citric acid found in food is a commodity chemical produced by feeding simple carbohydrates to *Aspergillus niger* mold and then processing the resulting fermented compound.  Citric acid-producing microorganisms grow on culture media that usually contain molasses (which is derived from sugar beet, a GM crop) and/or glucose (which usually comes from corn, another GM crop).  Calcium hydroxide and sulfuric acid are often used in processing.[36]

- **Inositol**.  This ingredient is included on the Institute for Responsible Technology's list of GMO ingredients.[37]  Commercial production of inositol follows a two-step process in which (1) phytic acid is extracted from plants, such as corn or rice, and (2) one of several chemical processes is used to transform the phytic acid into inositol.  The phytic acid is extracted by soaking the vegetable material in a dilute acid solution, such as hydrochloric acid or sulfuric acid, and then using filtration or another mechanical separation technique followed by precipitation using an alkali reagent and additional mechanical separation.  The extracted phytin is then converted to inositol as the phytin is hydrolyzed with a strong sulfuric acid solution

---

The United States currently devotes nearly 75 million acres of land to the production of soybeans, most of which are fed to animals.  Similarly, much of the nation's 80 to 90 million acres of corn is fed to livestock.  Since 85 to 95% of these crops are GMO, it is safe to assume – unless provided proper certification – that "normal" dairy products contain GMO ingredients in one form or another.

In the United States more than 99% of farm animals come from factory farming.  Conventional cattle grown in [concentrated animal feeding operations ('CAFOs')] is fed what is called concentrated feed.  It can mean any number of things, but the base food is always a grain slurry, typically of GMO corn and corn byproducts, GMO soy and soy hulls, and other grains and cereals.  CAFO nutritionists sometimes also include GM cotton byproducts and GM sugar beets in their cows' diet.

*Id.* (emphasis added).

[35] *See supra* n. 33.
[36] *See* Chef Alain Braux, *GMO 101, A Practical Guide*, 103 (2014); *see also* New Hope Network, *Is citric acid natural* (Dec. 19, 2004), *available at* https://www.newhope.com/ingredients-general/is-citric-acid-natural (last accessed Mar. 11, 2022).
[37] *See supra* n. 33.

and then steamed pressured. The result is a synthetic that is industrially manufactured.

- **Soluble Corn Fiber**. This ingredient is included on the Institute for Responsible Technology's list of GMO ingredients.[38]  Soluble corn fiber, also referred to as resistant maltodextrin, is a non-digestible fiber made from GMO corn syrup, which is chemically processed. It is produced using enzymatic hydrolysis, a process that involves breaking the chemical bonds of a molecule using enzymes.[39] During this process, it is then heated, hydrolyzed, and filtered into a white tasteless powder. Commercially, soluble corn fiber used in food products to thicken processed foods like protein bars, cereals, baked goods, dairy products, and salad dressings, and as a sweetener in place of sugar.

- **Soy Lecithin**. This ingredient is included on the Institute for Responsible Technology's list of GMO ingredients.[40]  Soy lecithin, or lecithin, is a processed by-product of the production of soybean oil, which comes from GM soybean. It is derived from the sludge left after crude oil undergoes a degumming process. More specifically, to produce soybean oil, soybeans are ground into small fragments and then flakes. The flakes are then combined with hexane or another similar solvent. The resulting product is subjected to heat to remove the solvents. Clarified soybean oil is then produced when the gum and water are mechanically separated from the crude soybean oil. The waste sludge or gum left remaining is then dried to produce lecithin.

- **Soy Protein**. This ingredient is included on the Institute for Responsible Technology's list of GMO ingredients.[41]  Soy proteins derive from GM

---

[38] *See supra* n. 33.

[39] *See* Healthline, *Is Soluble Corn Fiber Good for You? Benefits and Side Effects* (Mar. 18, 2021), https://www.healthline.com/nutrition/soluble-corn-fiber (last accessed Mar. 11, 2022); *see also* Dr. David Friedman's Health Blog, *Are You Eating Soluble Corn Fiber?*, https://doctordavidfriedman.com/blog/are-you-eating-soluble-corn-fiber (last accessed Mar. 11, 2022).

[40] *See supra* n. 33.
[41] *See supra* n. 33.

soybeans and are mainly used as ingredients in formulated foods.  It is made from soybean meal that has been dehulled and defatted.  Dehulled and defatted soybeans are processed into three kinds of high protein commercial products: soy flour, soy protein concentrate (SPC), and soy protein isolate (SPI).[42]  As shown below, each of Defendant's Products lists one or both of the latter two forms of GMO soy protein as a primary ingredient.

- **Soy Protein Isolate (SPI)**.  This ingredient is included on the Institute for Responsible Technology's list of GMO ingredients.[43]  SPI is protein from GM soybeans that has been isolated from all the other ingredients in soy via chemical engineering.  To do this, the soybeans are first washed with an acid and then neutralized in an alkaline solution.  During this process, the soybean is chemically modified, processed, and filled with pesticides.  Thus, SPIs "are genetically modified foods."[44]  The extraction process often leaves behind residue from chemicals and metals like hexane or aluminum, and it also strips the powder of the zinc and iron typically present in soybean products.  At the end of the entire SPI-making process, what remains is a dry powder that is about 90-95% protein and nearly carbohydrate- and fat-free.  Additionally, SPI also contains phytates, also called anti-nutrients, which reduce the body's ability to absorb iron and zinc.  SPI has been used since 1959 in foods for its functional properties.  It is often used in products like protein bars, flour, cereal, and meat and dairy alternatives.[45]

---

[42] *See* E.W. Lucas, et al., *Soy Protein Products: Processing And Use*, 125 J. Nutr (1995), 573S, *at* https://pubmed.ncbi.nlm.nih.gov/7884536/; *see also* G N Bookwalter, *Soy Protein Utilization In Food Systems*, 105 Adv Exp Med Biol (1978), 749, *at* https://pubmed.ncbi.nlm.nih.gov/569429/ (last accessed Mar. 11, 2022).

[43] *See supra* n. 33.

[44] Eat This, Not That!, *What is Soy Protein Isolate and Is It Bad For You?* (Jan. 4, 2020), https://www.eatthis.com/soy-protein-isolate/ (last accessed Mar. 11, 2022) ("If you have an inflammatory condition or otherwise opt to stay away from GMO's, you probably want to steer clear of SPI.").

[45] *Id*.; *see also* Women's Health, *"Soy Protein Isolate" Is In So. Many. Things. But Is It Healthy?* (May 28, 2019), https://www.womenshealthmag.com/food/a27559289/soy-isolate-protein/ (last accessed Mar. 11, 2022).

1
2
3
4
5
6
7
8

- **Soy Oil**. This ingredient is included on the Institute for Responsible Technology's list of GMO ingredients.[46]  Soy or soybean oil is made by extracting oil from whole soybeans.  This process involves dehulling and crushing soybeans, adjusting the soybeans for moisture content, and heating the soybeans to between 140-190 °F.  The soybeans are then rolled into flakes which are then put in a percolation extractor and immerged with a solvent, normally hexane.  The hexane is then separate from the soybean oil in evaporators.  The evaporated hexane is recovered and returned to the extraction process.

9
10
11
12
13
14
15
16
17

- **Whey Protein**.  This ingredient is included on the Institute for Responsible Technology's list of GMO ingredients.[47]  Whey protein is made with the protein isolated from the liquid by-product of cheese.  Commercially produced whey protein from cow's milk typically comes in four major forms: whey protein isolate (WPI), whey protein concentrate (WPC), whey protein hydrolysate (WPH), and native whey protein.  WPCs are 29–89 percent protein by weight.  WPIs, which are further processed to remove all the fat and lactose, are usually at least 90 percent protein.[48]  Accordingly, Defendant's Non-GMO Claims about its Products are deceptive and misleading to reasonable consumers.

18
19
20
21
22

42.    For example, one of Defendant's Products, "Similac Pro-Advance Infant Formula with Iron Milk-Based Powder," as purchased by Plaintiff, prominently represents that it is "Non-GMO."   However, as shown below, the Product contains several genetically modified ingredients, including nonfat milk, lactose, whey protein concentrate, soy oil, soy lecithin, and mixed tocopherols:

23
24
25
26
27
28

---

[46] *See supra* n. 33.
[47] *See supra* n. 33.
[48] WPI goes through the same initial processing as WPC; however, to isolate the protein to higher concentrations than typical WPC, WPI is sent through additional filtering loops, which further removes lactose, fat, and undesired minerals.

1

2

3

4

5

6

7

8

9

10

11



12   43.   Likewise, Defendant's Similac "Pro-Advance Infant Formula with Iron

13   Ready to Feed" prominently represents that it is a "NON-GMO" Product.  However,

14   the Product contains several genetically modified ingredients, including nonfat milk,

15   lactose, whey protein concentrate, soy oil, soy lecithin, inositol, and mixed

16   tocopherols:

17

18

19

20

21

22

23

24

25

26

27

28



44.     Similarly, Defendant's "Similac Pro-Sensitive Infant Formula with Iron Milk-Based Formula" also prominently represents that it is "Non-GMO."  However, the Product contains several genetically modified ingredients, including corn syrup, milk protein isolate, soy oil, soy lecithin, inositol, and mixed tocopherols:




45.     Defendant's "Similac Pro-Sensitive Infant Formula with Iron Milk-Based Ready to Feed" prominently represents that it is "Non-GMO."  However, the Product contains several genetically modified ingredients, including corn maltodextrin, milk protein isolate, soy oil, soy lecithin, and inositol:



**Ingredients**

Water, Corn Maltodextrin, Milk Protein Isolate, High Oleic Safflower Oil, Sugar, Soy Oil, Coconut Oil. Less than 0.5% of: C. Cohnii Oil, M. Alpina Oil, 2'-Fucosyllactose, Short-chain Fructooligosaccharides, Beta-Carotene, Lutein, Potassium Citrate, Calcium Phosphate, Carrageenan, Potassium Chloride, Ascorbic Acid, Soy Lecithin, Monoglycerides, Magnesium Chloride, Calcium Carbonate, Inositol, Magnesium Phosphate, Choline Chloride, Ferrous Sulfate, Choline Bitartrate, Taurine, Zinc Sulfate, L-Carnitine, d-Alpha-Tocopheryl Acetate, Niacinamide, Calcium Pantothenate, Riboflavin, Vitamin A Palmitate, Copper Sulfate, Thiamine Hydrochloride, Pyridoxine Hydrochloride, Folic Acid, Potassium Iodide, Manganese Sulfate, Phylloquinone, Biotin, Sodium Selenate, Vitamin D3, Vitamin B12, Potassium Hydroxide, and Nucleotides (Adenosine 5'-Monophosphate, Cytidine 5'-Monophosphate, Disodium Guanosine 5'-Monophosphate, Disodium Uridine 5'-Monophosphate).

46.     Likewise, Defendant's Similac Pro-Total Comfort Infant Formula with Iron Milk-Based Powder contains the prominent "Non-GMO" representation directly on the front of the product packaging.   However, the Product contains several genetically modified ingredients, including corn maltodextrin, whey protein hydrolysate, soy oil, and mixed tocopherols:



1

2

3

4

5

47.    Similac Pro-Total Comfort Infant Formula with Iron Milk-Based Ready to Feed contains the prominent "Non-GMO" representation directly on the front of the Product packaging.  However, the Product contains several genetically modified ingredients, including corn syrup solids, whey protein hydrolysate, soi oil, soy lecithin, and inositol:

6

7

8

9

10

11

12

13

14

15

16

17



18

19

20

21

22

48.    Defendant's "Go & Grow by Similac Milk-Based Powder" also prominently features a Non-GMO label directly on the front of the packaging. However, the Product contains several genetically modified ingredients, including nonfat milk, lactose, soy oil, soy lecithin, inositol, and mixed tocopherols:

23

24

25

26

27

28



49.     Likewise, Defendant's "Go & Grow by Similac Sensitive Milk-Based Powder" prominently features a Non-GMO representation directly on the front of the Product packaging.   However, the Product contains several genetically modified ingredients, including corn syrup, milk protein isolate, soy oil, and mixed tocopherols:



50.     Similarly, Defendant's "Similac for Supplementation Infant Formula with Iron" bottles are prominently labeled "Non-GMO" on the front of the packaging.   But this formula contains several genetically modified ingredients, including nonfat milk, lactose, soy oil, and whey protein concentrate:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23    51.    Defendant's "Similac for Supplementation Powder Milk-Based Infant
24  Formula" is also prominently labeled as "Non-GMO" directly on the front of the
25  Product packaging.  However, the Product contains multiple genetically modified
26  ingredients, including nonfat milk, lactose, whey protein concentrate, soy oil, soy
27  lecithin, and mixed tocopherols:
28

52.     The presence of genetically modified ingredients in the Products renders Defendant's description of "Non-GMO" false and misleading under an objective reasonable consumer standard.

## RULE 9(B) ALLEGATIONS

53.     Federal Rules of Civil Procedure, Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

54.     **WHO:** Defendant made material misrepresentations and omissions of fact in the labeling, packaging, and marketing of the Products.

55.     **WHAT:** Defendant made material misrepresentations and omissions of fact by using the terms "Non-GMO" in the labeling, packaging, and marketing of the Products.  Defendant made these claims with respect to the Products even though the Products did not meet the requirements to make such claims.   Defendant's misrepresentations and omissions were material because a reasonable consumer would not have purchased or paid as much for the Products if he or she knew that they contained false representations.

56.     **WHEN:**     Defendant made the material misrepresentations and omissions detailed herein continuously throughout the Class Period.

57.     **WHERE:**  Defendant's material misrepresentations and omissions were made, *inter alia*, on the labeling and packaging of the Products, on Defendant's website at https://www.similac.com/, on the websites of authorized third-party retailers of the Products, on in-store signage at brick-and-mortar locations of authorized third-party retailers of the Products, and through Defendant's various other advertisements.

58.   **HOW:**   Defendant made written misrepresentations and failed to disclose material facts on the labeling and packaging of the Products and on its website and other advertising.

59.   **WHY:**   Defendant engaged in the material misrepresentations and omissions detailed herein for the express purpose of inducing Plaintiff and other reasonable consumers to purchase and/or pay a premium for Products based on the belief that they were "Non-GMO."  Defendant profited by selling the Products to millions of unsuspecting consumes nationwide.

## CLASS ALLEGATIONS

60.   ***Class Definition.***   Plaintiff brings this action on behalf of a class of similarly situated individuals, defined as all persons in the United States who, who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased any of the Products at issue (the "Class").

(a)   ***California Subclass.***   Plaintiff Rocio Lopez also seeks to represent a subclass of all Class Members who, within the applicable statute of limitations period, up to an including the date of final judgment in this action, purchased any of the Products at issue in California (the "California Subclass").

61.   Excluded from the Class and the California Subclass are persons who made such purchase for purpose of resale, Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, and members of the judge's staff, and the judge's immediate family.

62.   Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class or Subclass should be expanded or otherwise modified.

63.   ***Numerosity.***   Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclass number in the millions.  The precise number of Class

Members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

64.  ***Commonality and Predominance.***  Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members.  Common legal and factual questions include but are not limited to: whether Defendant warranted the Products as "Non-GMO"; whether the Products contain genetically modified organisms; whether Defendant breached these warranties; and whether Defendant committed the statutory and common law violations alleged against them herein by doing so.

65.  ***Typicality.***  The claims of the named Plaintiff are typical of the claims of the Class in that Plaintiff purchased one of Defendant's Products in reliance on the representations and warranties described above and suffered a loss as a result of that purchase.

66.  ***Adequacy.***  Plaintiff is an adequate representative of the Class and the California Subclass because her interests do not conflict with the interests of the Class and the California Subclass Members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the Class and the California Subclass Members will be fairly and adequately protected by Plaintiff and her counsel.

67.  ***Superiority.***  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by

the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

68.     Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class and Subclass as a whole.

69.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and the California Subclass and will likely retain the benefits of its wrongdoing.

70.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of California's Unfair Competition Law ("UCL"),
California Business & Professions Code §§ 17200,** *et seq.*
**(On Behalf Of The California Subclass)**

71.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

72.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

73.     Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising[.]"

74.     Defendant's misrepresentations and other conduct, described herein, violated the "unlawful" prong of the UCL by violating the CLRA as described herein, the FAL as described herein, and Cal. Com. Code § 2607.

75.     Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

76.     Defendant violated the "fraudulent" prong of the UCL by making misrepresentations about the Products at issue that were untrue and misleading, as described herein.

77.     Plaintiff and the California Subclass lost money or property as a result of Defendant's UCL violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

78.     Accordingly, Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

79.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure that the Product's are not in fact Non-GMO; or (2) the removal of such representations, will

ensure that Plaintiff is in the same place she would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

## COUNT II
### Violation Of California's False Advertising Law ("FAL"), California Business & Professions Code §§ 17500, *et seq.* (On Behalf Of The California Subclass)

80. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

81. Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

82. California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

83. Defendant committed acts of false advertising, as defined by § 17500, by misrepresenting that the Products are "Non-GMO" products, when in fact they are not.

84. Defendant knew or should have known, through the exercise of reasonable care, that its Non-GMO Claims about the Products were untrue and misleading.

85. Defendant's actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived.

86.     Plaintiff and the California Subclass lost money or property as a result of Defendant's FAL violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

87.     Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

88.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure that the Product's are not in fact Non-GMO; or (2) the removal of such representations, will ensure that Plaintiff is in the same place she would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

## **<u>COUNT III</u>**
### **Violation Of California's Consumers Legal Remedies Act ("CLRA"),**
### **California Civil Code §§ 1750, *et seq*.**
### **(On Behalf Of The California Subclass)**

89.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

90.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

91.     Plaintiff and members of the Class are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that Plaintiff and the Class sought or acquired Defendant's goods and/or services for personal, family, or household purposes.

92.     Defendant's Products are "goods" within the meaning of Cal. Civil Code § 1761(a).  The purchases by Plaintiff and the Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

93.     The acts and practices of Defendant as described above were intended to deceive Plaintiff and the Class as described herein, and have resulted, and will continue to result, in damages to Plaintiff and members of the Class.  These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's acts and practices constitute representations deceiving that the Products have characteristics, uses, and/or benefits, which they do not have, in violation of Cal. Civil Code § 1770(a)(5); (b) Defendant's acts and practices constitute representations that the Products are of a particular standard, quality, or grade, when in fact they are of another, in violation of Cal. Civil Code § 1770(a)(7); and (c) Defendant's acts and practices constitute the advertisement of the Products in question with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9).

94.     Defendant violated these provisions of the CLRA by misrepresenting that the Products are "Non-GMO" products, when in fact they are not.

95.     Defendant knew or should have known, through the exercise of reasonable care, that its Non-GMO Claims about the Products were untrue and misleading.

96.     Plaintiff and the California Subclass suffered injuries caused by Defendant's CLRA violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they

paid a price premium for the Products due to Defendant's false and misleading promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

97.    Plaintiff, on behalf of herself and all other members the California Subclass, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

98.    In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendant prior to filing this action on October 7, 2021, informing Defendant of her intention to seek damages under California Civil Code § 1750.   The letter was sent via certified mail, return request, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated."  Accordingly, Plaintiff, individually and on behalf of the proposed California Subclass, seeks monetary damages from Defendant as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

99.    Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

100.   Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure that the

Product's are not in fact Non-GMO; or (2) the removal of such representations, will ensure that Plaintiff is in the same place she would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

## COUNT IV
### Breach Of Express Warranty
### (On Behalf Of The Nationwide Class And California Subclass)

101.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

102.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Defendant.

103.   Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products at issue, expressly warranted that the Products as "Non-GMO," among other Misrepresentations.

104.   In fact, the Products are not "Non-GMO" as Defendant claims, because they contain several ingredients derived from GMOs, and thus are not as marketed, advertised, and/or warranted.

105.   As a result of Defendant's false and/or misleading misrepresentations, including that the Products are "Non-GMO," the Products were defective and did not adhere to the express warranty when first sold to Plaintiff and Class Members, and have not been repaired, replaced, or otherwise remedied as originally warranted since the time of sale.

106.   By breaching its express warranty, Defendant has caused and continues to cause these warranties to fail of their essential purpose.

107.   Plaintiff and Class Members have been injured and harmed as a direct and proximate cause of Defendant's breach of express warranty because: (a) they would not have purchased the Products on the same terms if the true facts had been

known at the point of purchase; (b) they paid a price premium for the Products due to Defendant's false and misleading promises and warranties; and (c) the purportedly "Non-GMO" Products do not have the characteristics, uses, or benefits as promised by Defendant because they contain several ingredients derived from GMOs.

108.   Plaintiff, individually and on behalf of the Class and the California Subclass, seek all damages permitted by law, including compensation for the monetary difference between the Products as warranted and as sold, along with all other incidental and consequential damages, statutory damages, attorney's fees, and all other relief allowed by law.

## COUNT V
### Breach Of The Implied Warranty Of Merchantability
### (On Behalf Of The Nationwide Class And California Subclass)

109.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

110.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the California Subclass against Defendant.

111.   Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that the Products are "Non-GMO" when in fact they are not, among other Misrepresentations.

112.   Defendant breached the warranty implied in the contract for the sale of the Products because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, the goods were not fit for the ordinary purposes for which such goods are used, and the goods do not conform to the promises or affirmations of fact made on the label.  As a result, Plaintiff and Class Members did not receive the goods as impliedly warranted by Defendant to be merchantable.

113.   Plaintiff and Class Members purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

114. The Products were not altered by Plaintiff or Class Members.

115. The Products were defective when they left the exclusive control of Defendant.

116. Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and Class Members.

117. As a result of Defendant's false and/or misleading representation that the Products are "Non-GMO" (among other Misrepresentations), the Products were defectively designed and unfit for their intended purpose, and Plaintiff and Class Members did not receive the goods as warranted.

118. Plaintiff and Class Members have been injured and harmed as a direct and proximate cause of Defendant's breach of implied warranty because: (a) they would not have purchased the Products on the same terms if the true facts were known about the Products at the point of purchase; (b) they paid a price premium for the Products due to Defendant's false and misleading promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

## COUNT VI
### Unjust Enrichment / Restitution
### (On Behalf Of The Nationwide Class And California Subclass)

119. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

120. Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the California Subclass against Defendant.

121. To the extent the Court determines it is necessary to do so, this claim is pled in the alternative to the other legal claims alleged in the complaint.

122. Plaintiff and Class Members conferred benefits on Defendant by purchasing the purportedly "Non-GMO" Products. Defendant was and should have been reasonably expected to provide Products that conform with the qualities listed on their labeling and packaging.

123.   Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Products are "Non-GMO" products (among other Misrepresentations) at the time of sale.  These Non-GMO Misrepresentations caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts were known.

124.   Defendant unjustly profited from the sale of the Products at inflated prices as a result of its false representations, omissions, and concealment of the true qualities of the Products.  Defendant benefited at Plaintiff's and Class Members' expenses when it sold GMO-riddled Products that were inferior to the purportedly "Non-GMO" Products that Plaintiff and Class Members thought they were actually purchasing, yet the price they paid was the price for a "Non-GMO" Products that are 100% free of ingredients derived from GM crops or food sources, genetically engineered in a laboratory setting through the use of biotechnologies, or sourced from animals that have been raised on GMO feed.

125.   As a proximate result of Defendant's false representations, omissions, and/or concealment of the true qualities of the Products, and as a result of Defendant's resulting ill-gotten gains, benefits, and profits, Defendant has been unjustly enriched at the expense of Plaintiff and Class Members.  It would be inequitable for Defendant to retain its ill-gotten profits without paying the value thereof to Plaintiff and Class Members.

126.   There is a direct relationship between Defendant on the one hand, and Plaintiff and Class Members on the other, sufficient to support a claim for unjust enrichment.  Defendant marketed and sold the Products with the false and misleading Misrepresentations that they were "Non-GMO" on their labeling and packaging to improve retail sales, which in turn improved wholesale sales.  Conversely, Defendant knew that disclosure of the true and GMO-riddled nature of the Products would

suppress retail and wholesale sales of the Products, in turn suppressing the demand for the Products, and would negatively impact the reputation of Defendant's brand among Class Members and consumers.

127.   Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Plaintiff and Class Members are entitled to restitution for their unjust enrichment in the amount of Defendant's ill-gotten gains, benefits, and profits, including interest thereon. Accordingly, Plaintiff seeks, individually and on behalf of Class and the California Subclass Members, an order requiring Defendant to disgorge its gains and profits to Plaintiff and members of the Classes, together with interest, in a manner to be determined by the Court.

128.   Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

129.   Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure that the Product's are not in fact Non-GMO; or (2) the removal of such representations, will ensure that Plaintiff is in the same place she would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT VII
### Negligent Misrepresentation
### (On Behalf Of The Nationwide Class And California Subclass)

130.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

131.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the California Subclass against Defendant.

132.   As discussed above, Defendant misrepresented that the Products are "Non-GMO" (among other misrepresentations), notwithstanding the fact that the Products do contain several ingredients derived from GMOs and are therefore not, in fact, "Non-GMO" as their labeling and packaging prominently states.

133.   At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.   At an absolute minimum, Defendant negligently misrepresented as "Non-GMO" and/or negligently omitted material facts about the Products at issue, namely that the Products do, in fact, contain GMOs.

134.   Defendant had no reasonable grounds for believing that its representations were true because Defendant failed to consistently ensure that it was able to produce the Products as free of GMOs, as advertised.

135.   The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class Members reasonably and justifiably relied, were intended to induce, and actually did induce, Plaintiff and Class Members to purchase the Products.   In making these negligent misrepresentations and omissions to Plaintiff and the Class, upon which Plaintiff and Class Members reasonably and justifiably relied, Defendant intended to induce, and actually did induce, Plaintiff and Class Members to purchase its "GMO-Free" Products.

136.   At all times herein, Plaintiff and Class Members were unaware of the falsity of Defendant's statements.

137.   Plaintiff and Class Members reasonably acted in response to the statements made by Defendant when they purchased the Products.

138.   As a direct and proximate result of Defendant's negligent misrepresentations and omissions regarding the true nature of the Products, Plaintiff and Class Members were injured.  Specifically, Plaintiff and Class Members incurred economic harm as a result of Defendant's negligent misrepresentations and/or omissions in that they would not have purchased the Products or would not have purchased them on the same terms, but for Defendant's unlawful conduct alleged herein.   Accordingly, Plaintiff and Class Members are entitled to compensatory and/or punitive damages in an amount to be proven at trial.

## COUNT VIII
### Fraud
### (On Behalf Of The Nationwide Class And California Subclass)

139.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

140.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

141.   As discussed above, Defendant provided Plaintiff and Class Members with false or misleading material information and failed to disclose material facts about the Products, including but not limited to the fact that each of the purportedly "Non-GMO" Products do indeed contain several ingredients derived from GMOs and are therefore not, in fact, "Non-GMO" as their labeling and packaging prominently states.   These misrepresentations and omissions were made with knowledge of their falsehood.

142.   These misrepresentations and omissions made by Defendant, upon which Plaintiff and Class Members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiff and Class Members to purchase the Products.

1  143.   The fraudulent actions of Defendant caused damage to Plaintiff and

2  Class and the California Subclass Members, who are entitled to damages and other

3  legal and equitable relief as a result.

4  144.   Further, as a result of Defendant's willful and malicious conduct,

5  punitive damages are warranted.

6  ### COUNT IX

7  **Fraudulent Misrepresentation**
**(On Behalf Of The Nationwide Class And California Subclass)**

8  145.   Plaintiff hereby incorporates by reference the allegations contained in

9  all preceding paragraphs of this complaint.

10  146.   Plaintiff brings this claim individually and on behalf of the members of

11  the proposed Class and the California Subclass against Defendant.

12  147.   At all relevant times, Defendant was engaged in the business of

13  manufacturing, marketing, packaging, distributing, and selling the Products.

14  148.   Defendant, acting through its representatives or agents, delivered the

15  Products to its own distributors and various other distribution channels.

16  149.   Defendant willfully, falsely, and knowingly omitted various material

17  facts regarding the true nature, quality, and characteristics of the Products, namely

18  pertaining to the "Non-GMO" representation.

19  150.   Rather than inform consumers of the truth regarding the GMOs in the

20  Products, Defendant misrepresented the Products as "Non-GMO" at the time of

21  purchase.

22  151.   Defendant made these material misrepresentations to boost or to

23  maintain sales of the Products, and to falsely assure purchasers that it is a company

24  that cares about GMOs in foods, as discussed throughout.  The false representations

25  were material to consumers, including Plaintiff, because the representations played a

26  significant role in the decision to purchase the Products.

27

28

152.   Plaintiff and Class Members accepted the terms in purchasing the Products, which were silent on the true quality, nature, and characteristics of the Products.   Plaintiff and Class Members had no reasonable way of knowing of Defendant's misrepresentation as to the Products, and had no way of knowing that the misrepresentations were misleading.

153.   Although Defendant had a duty, arising, in part, from its superior knowledge, to ensure that accuracy of the information regarding whether its ingredients were in fact genetically modified, it did not fulfill these duties.

154.   Instead, Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales were essential for its continued growth and to maintain and grow its reputation as a producer of Non-GMO foods. Such benefits came at the expense of Plaintiff and Class Members.

155.   Plaintiff and Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.   Plaintiff's and the Class Members' actions were justified given Defendant's misrepresentations.   Defendant was in the exclusive control of material facts, and such facts were not known to the public.

156.   Due to Defendant's misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of Products that did not live up to their advertised and packaged representations, especially those concerning the GMO-free representations.   Plaintiff and Class Members are entitled to recover full or partial refunds for Products they purchased due to Defendant's misrepresentations, or they are entitled to damages for the diminished value of their Products, amounts to be determined at trial.

157.   Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff and Class member's rights and well-being, and in part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to

1   drive consumers away from consideration of competitor's products, and to boost its

2   reputation as a maker of Non-GMO foods.   Defendant's conduct warrants an

3   assessment of punitive damages in an amount sufficient to deter such conduct in the

4   future.

## **JURY DEMAND**

5

6       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

7   jury of any and all issues in this action so triable as of right.

## **REQUEST FOR RELIEF**

8

9       WHEREFORE, Plaintiff, individually and on behalf of all others similarly

10  situated, seeks judgment against Defendant, as follows:

11

12      (a)   For an order certifying the nationwide Class and the California

13            Subclass under Rule 23 of the Federal Rules of Civil Procedure
            and naming Plaintiff as representative of the Class and of the

14            California Subclass, and Plaintiff's attorneys as Class Counsel to
            represent the proposed Class and Subclass;

15

16      (b)   For an order declaring that Defendant's conduct violates the
            statutes referenced herein;

17

18      (c)   For an order finding in favor of Plaintiff, the Class, and the
            California Subclass on all counts asserted herein;

19

20      (d)   For compensatory, statutory, and punitive damages in amounts to
            be determined by the Court and/or jury;

21

22      (e)   For prejudgment interest on all amounts awarded;

23      (f)   For an order of restitution and all other forms of equitable

24            monetary relief;

25      (g)   For injunctive relief as pleaded or as the Court may deem proper;

26

27      (h)   For an order awarding Plaintiff and members of the Class and
            Subclasses their reasonable attorneys' fees and reimbursement of

28            litigation expenses and costs of suit; and

1

2

         (i)     For such other and further relief as the Court may deem proper.

3

4

Dated: March 30, 2022          Respectfully submitted,

5

                    **BURSOR & FISHER, P.A.**

6

7

                    By:   */s/ L. Timothy Fisher*

8

                    L. Timothy Fisher (State Bar No. 191626)

9

                    Sean L. Litteral (State Bar No. 331985)

Julia K. Venditti (State Bar No. 332688)

10

                    1990 North California Boulevard, Suite 940

Walnut Creek, CA  94596

11

                    Telephone: (925) 300-4455

12

                    Facsimile: (925) 407-2700

Email: ltfisher@bursor.com

13

                           slitteral@bursor.com

14

                           jvenditti@bursor.com

15

                    *Attorneys for Plaintiff and the Putative Class*

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, L. Timothy Fisher, declare as follows:

1.     I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Rocio Lopez.  Plaintiff Lopez resides in Imperial, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.     The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Southern District of California, as Plaintiff purchased the Products from brick-and-mortar retails stores located within this District.  Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Plaintiff from this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 30th day of March, 2022.

_/s/ L. Timothy Fisher_
L. Timothy Fisher